**LOMBARD CORPORATION, Plaintiff,**

**v.**

**Stanley R. RESOR, Secretary of the Army, et al., Defendants.**

**Civ. A. No. 2200–70.**

United States District Court, District of Columbia.

Nov. 19, 1970.

David V. Anthony, Washington, D. C., for plaintiff.

Thomas A. Flannery, U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM

PRATT, District Judge.

Plaintiff is an unsuccessful bidder for a contract issued by the Chamberlain Manufacturing Corporation. This matter is before the Court on plaintiff's motion for preliminary injunction, and defendants' motion to dismiss the complaint, or in the alternative, for summary judgment. A hearing was held on these motions on August 21, 1970. Following the hearing the parties submitted supplemental affidavits and memoranda.

### I. THE FACTS.

In October, 1968, plaintiff was invited to submit a bid for the design and manufacture of two 155 mm. forging press lines, to be installed in the Scranton Army Ammunition Plant, owned by the U. S. Government and operated by Chamberlain on a cost-reimbursable basis for the Army. Plaintiff submitted its proposal on October 25, 1968, quoting a total price of $1,375,000 for the two press lines. Only one other bid was received, that being from Verson All Steel Press Co., for roughly twice the amount of plaintiff's bid. Chamberlain was required under the terms of its cost-reimbursable facilities contract with the Army to have all subcontracts totalling over $100,000 approved before work was begun. In this instance, because of the importance of the project and the large disparity in price, Chamberlain requested that the Defense Contract Administration Services Office (hereinafter re-

ferred to as DCASO) conduct a pre-award survey of Lombard to determine if it was qualified to do the work. That survey, completed on December 17, 1968, recommended that no award be made to Lombard because it was not a "responsible" bidder.[1]

Chamberlain accordingly canceled the original solicitation and issued a second, to which Lombard was not invited to respond. Through an alleged oversight, plaintiff was never formally notified that its bid had been rejected and that a second solicitation was taking place. Upon learning informally of the resolicitation, Lombard filed a protest with the Comptroller General on March 26, 1969, on the ground that it had submitted the lowest responsive bid, rejection of which would be prejudicial to the interest of the United States. After a conference on July 9, 1969, representatives of the Comptroller's office agreed that mistakes had been committed in the DCASO survey and that exclusion of the plaintiff on the basis of that report was therefore improper, but no finding was made that plaintiff should have been awarded the contract.[2] Chamberlain was directed to issue a third solicitation which would include Lombard, although this procedure was objected to, plaintiff taking the position that this would be without prejudice to its protest under the first solicitation. Since the Army apparently felt that the original specifications were subject to wide interpretation, they were supplemented in the third solicitation, and bids were requested on an additional press line.

Plaintiff submitted a bid on the third solicitation identical to its earlier proposal, in spite of the addition of the third line and the more detailed specifi-

cations. Indeed, this was a summary bid, incorporating the earlier papers. After holding standard negotiating conferences with Lombard on its proposal and allowing time for the filing of supplemental papers, Chamberlain determined that the bid of Lombard was non-responsive and it was rejected. Contracts for the press lines were awarded to Erie Foundry and the E. W. Bliss Company. Plaintiff then filed a written protest with the Comptroller General's office. This was rejected on April 7, 1970, with the statement that the award would not be questioned "in the absence of illegality or a showing that a proposed award is definitely against the interests of the United States."

Lombard brought this action on July 23, 1970, seeking preliminary and permanent injunctions against any payments by the United States to Chamberlain on the contracts in question, and a declaratory judgment that it was "entitled" to be awarded the contract under the doctrine of Scanwell Laboratories v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). Although plaintiff originally sought damages, it deleted this request in an amended complaint filed August 19, 1970.

## II. THE GOVERNMENT'S MOTION TO DISMISS.

The Government by way of response filed a motion to dismiss the complaint and has advanced five different reasons in support thereof: (1) plaintiff lacks standing to bring the action[3]; (2) Chamberlain is an indispensable party; (3) plaintiff has no legally protected interest which would allow it the relief it requests; (4) the suit is unconsented and hence is impermissible because of

---

1. A determination that a corporation is responsible includes consideration of such factors as financial strength, technical competence, and past performance on similar contracts.

2. The Comptroller's office did suggest that the differences between the parties might well be negotiated but it is clear that were a court to award plaintiff the con-

tract based on its first bid, it would be making a contract for the parties.

3. Although the original motion does not set this out precisely, at the hearings and in its supplemental papers the Government makes clear that it feels plaintiff lacks standing because this is a private contract, procured by an independent contractor.

sovereign immunity; and (5) the action is barred by laches. It is the judgment of the Court that none of these arguments is viable.

(1) *Plaintiff's standing to sue.*

■ The Government contends that Chamberlain is not a purchasing agent for the Army, but rather is an independent contractor, and hence any contract between Chamberlain and another firm would be a private one, to which the United States is not a party. Under this analysis the Armed Services Procurement Act, 10 U.S.C. § 2301 *et seq.* would not apply to the procurement in this case, although the Government does admit to applying a general standard of fairness in evaluating Lombard's proposals and complaints. Taking all of this into account, the Government urges that plaintiff lacks standing to challenge the award under the *Scanwell* doctrine.

While the record indicates clearly that Chamberlain is not a procurement agent for the Army in the usual sense, just as clearly it possesses something more than the status of an independent contractor. The Government and Chamberlain are intimately involved in every aspect of the operation of the Scranton plant. The Government owns the factory and manufacturing equipment; title to new "facilities" such as the press lines in question passes directly to the Government upon delivery by the vendor to Chamberlain; Army personnel work closely with Chamberlain's engineers in drawing up the specifications for a solicitation; the cost-reimbursable contract between the Army and Chamberlain contains many provisions incorporating various sections of the Armed Services Procurement Regulations (ASPR); inter-firm correspondence indicates that Chamberlain considered itself an agent for at least some purposes while making the procurement (for example, so far as application of the Government regulation pertaining to gratuities is concerned); Mr. Bill Defee, Manager of the Modernization Engineering Department of the Scranton plant, indi-

cated that Chamberlain considered ASPR applicable to its contracts (Exhibit G–1 in the Administrative Record, P. 6); finally, in the first solicitation Chamberlain stated:

1. This purchase order is issued under a United States Government contract and must contain certain terms and conditions required by U. S. statutes and regulations. Seller agrees that the contract clauses in the following Armed Services Procurement Regulations, and other Government regulations effective as of the date of this purchase order, are hereby incorporated herein by reference. * * *

2. DEFINITIONS—Wherever the following words appear in the various sections of the Armed Services Procurement Regulations or other Government regulations cited or incorporated herein by reference, such words shall be defined as follows: * * * (c) "Government" shall mean "Government and/or CHAMBERLAIN MANUFACTURING CORP."

Even the Comptroller General noted in his letter of April 7, 1970 to the Secretary of the Army that the "frame of reference guiding such determinations should be the Federal norm that is embodied in the procurement statutes and implementing regulations," although "every detail of the Federal norm is not for application. (This is not to say, however, that where, as a result of Government intervention, the prime contractor's procurement practices and procedures mirror Federal procurement procedures, the Federal norm should not be applied. * * *") Further in that letter it is stated that in the instant case, "the Government directly participated in the decision to reject Lombard's proposal and to exclude it from participation in the resolicitation."

The contract between Chamberlain and the Government refers to Chamberlain as an independent contractor only for the purposes of *maintenance* of the plant and its facilities, see part III of Modification 31, Exhibit I of Ad-

ministrative Record. Whatever the precise definition of Chamberlain's status, it is the judgment of this Court that the Government is sufficiently involved so that the principles of *Scanwell* are applicable. We therefore hold that the ASPR were applicable to the procurement of the press lines in question, and that this "disappointed bidder", who made a prima facie showing of arbitrariness, should have standing to challenge the award of the disputed contract. As the Court of Appeals said in *Scanwell*:

> "When the Congress has laid down guidelines to be followed in carrying out its mandate in a specific area, there should be some procedure whereby those who are injured by the arbitrary or capricious action of a governmental agency or official in ignoring those procedures can vindicate their very real interests, while at the same time furthering the public interest. These are the people who will really have the incentive to bring suit against illegal government action, and they are precisely the plaintiffs to insure a genuine adversary case or controversy." 424 F.2d at 864.

> "It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties. It is also incontestible that that discretion may not be abused. Surely there are criteria to be taken into consideration other than price; contracting officers may properly evaluate those criteria and base their final decisions upon the result of their analysis. *They may not base decisions on arbitrary or capricious abuses of discretion, however, and our holding here is that one makes a prima facie showing alleging such action on the part of an agency or contracting officer has standing to sue under section 10 of the Administrative Procedure Act.*" (Emphasis added.) 424 F.2d at 869.

(2) *Failure to join Chamberlain as an indispensable party.*

The Government next suggests that even if Lombard has standing to challenge the award, its suit is doomed for failure to join Chamberlain as an indispensable party. It suggests that the case be dismissed or transferred to a district where Chamberlain is subject to service. The presence of Chamberlain would, no doubt, be helpful in elucidating the reasons for plaintiff not receiving the contract in question. But the Government has experienced no difficulty in obtaining from Chamberlain information necessary to the defense of this suit. Indeed, the Government has relied extensively on affidavits of key officers of Chamberlain, and there is no question that Chamberlain is fully aware of everything occurring in this action. The suit, moreover, is in effect one on behalf of the Government as a whole, with the disappointed bidder acting as a private attorney general. The purpose of the suit is not just to transfer the contract from one firm to another, but rather to maintain the integrity of the competitive bidding process and to save the taxpayers money by ensuring that proper procedures are followed in the letting of contracts.

Whether Chamberlain is considered to be a *de facto* procurement agent for the Army, see U. S. v. Livingston, 179 F. Supp. 9, 22 (E.D.S.C.1959) aff'd 364 U. S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719; City of New Orleans v. United States, 371 F.2d 21, 23 (5th Cir. 1967); 39 Compt.Gen. 459 (1959) or only some form of hybrid agent-contractor, there are persuasive reasons for not finding it to be indispensable. The Court cannot award the contract to a particular party or make a contract for the parties. All that it has the power to do is enjoin the payment of money on the contract if the relevant regulations have not been complied with. The Government is paying for the presses in question, and it is the Government's regulations which allegedly have been violated. Plaintiff could

not have sued as a disappointed bidder at all, absent Government ties to this contract. While a judgment in favor of plaintiff would unquestionably prejudice Chamberlain, since it would remain liable on its subcontracts, that prejudice could be completely eliminated by intervention, a step which plaintiffs have invited. Moreover, a judgment entered in Chamberlain's absence would be viable; it would accord complete relief to the parties presently before the Court. A determination of indispensability is not jurisdictional, but is largely discretionary with the Court. For all the reasons set forth above, "equity and good conscience" dictate that Chamberlain not be found to be indispensable. The Court holds that Chamberlain is a necessary party, not an indispensable one.

3. *Plaintiff's legally protected interest.*

The Government's contention that plaintiff has no legally protected interest, citing Perkins v. Lukens Steel Co., 310 U.S. 113, 126–130, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) is insubstantial. Plaintiff, and others like it, have a litigable interest in attempting to protect the public interest in the integrity of the competitive bidding process, including the very real interest in having contracts awarded to the lowest responsive bidder whenever appropriate. As discussed above, many of the provisions of ASPR are applicable to the facilities contract between Chamberlain and the Government. A contracting officer has no authority to enter into contracts which are prejudicial to the interest of the United States, see 22 Compt.Gen. 367, 371; 41 Compt.Gen. 424, 427. If Chamberlain does not comply with ASPR, thus possibly making an award contrary to the best interest of the Government, then it would be illegal for the United States to expend funds pursuant to that contract.

The holding in *Perkins* clearly seems to have been overruled by the passage of the Administrative Procedure Act, especially as that Act has been elucidated in *Scanwell* and succeeding cases. The Government raised this litigable interest theory in *Scanwell* itself by applying for a petition for rehearing in light of the Supreme Court's decision in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S. Ct. 827, 25 L.Ed.2d 184 (March 3, 1970). In that petition the Government argued at page 3,

"that, since this Court did not find that a disappointed bidder possesses any 'legal right' which is invaded by an allegedly unlawful award of a contract to a competitor * * * the claim of the plaintiff here—which the Supreme Court has just held depends, on the merits, on the existence of such a legal right—must be rejected on the merits."

That petition was denied by the Court of Appeals per curiam, see Scanwell Laboratories v. Shaffer, 137 U.S.App.D. C. 371, 424 F.2d 859 (1970). It would be curious indeed to hold out the offer of standing to a prospective plaintiff in a case such as this, and then immediately revoke that offer by holding that he possesses no legal interest protected by statute. The Court of Appeals has not dealt directly with this problem yet, but in Blackhawk Heating and Plumbing Co. v. Driver, 433 F.2d 1137 (D.C.Cir., 1970), it stated in dictum:

"The criteria for standing which were enumerated in the above cases indicate that a party aggrieved in fact by agency action has standing to challenge that action, even in the absence of 'person aggrieved' language in the statute under which the agency action is taken, if he is able to demonstrate injury in fact, if he is able to show that the interest he asserts is 'arguably' within the zone of interests the statute seeks to protect, and if a perusal of the statute reveals no legislative intent that judicial review should be withheld." 433 F.2d at 1140.

4. *The defense of sovereign immunity.*

The argument that the suit is unconsented requires only passing com-

ment. Section 10 of the Administrative Procedure Act provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. Sec. 702.

The Court of Appeals in *Scanwell* stated that enactment of this provision evidenced an "intention on the part of Congress to waive the right of sovereign immunity; any other construction would make the review provisions illusory." 424 F.2d at 874.

### 5. *The defense of laches.*

■ Finally, the Government suggests that the doctrine of laches should bar this suit, since substantial funds have already been spent on the contract, and because plaintiff waited for three months before filing suit. Although it would certainly have been desirable for plaintiff to have filed suit immediately, the Government was notified prior to its award of the contract that an action would be filed. Because this type of suit is relatively new, three months does not seem an unreasonably long time within which to sue. Moreover, at the time suit was filed, very little performance had been begun under the contract. The Court is somewhat concerned, however, that Chamberlain may have endeavored to spend money on this project as fast as possible in order to preclude court action. A twenty-day extension was originally granted defendants for time to answer the complaint and file motions, during which time over $1,-500,000 was allegedly spent or contracted for. While it is obvious that an agency or contractor cannot afford to stop all action every time a disappointed bidder files for relief, it should be noted that in a case in which the Court felt there was arbitrary action in the award of a contract, we would not hesitate to enjoin further payment by the Government, letting the chips fall where they may.

## III. THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT.

■■ The Government has also filed a motion for summary judgment. As the Court of Appeals pointed out in *Blackhawk*, elimination of the artifical barrier of standing "does not mean the traditional legitimate bars to frivolous lawsuits have also been abrogated," 433 F.2d at 1141, suggesting that summary judgment was an appropriate device.

Most of plaintiff's criticisms in the present case center around the first solicitation. As discussed above, Lombard had made the lowest bid on that solicitation, but a pre-award survey conducted by DCASO recommended against awarding of the contract to plaintiff, for reasons which were later judged by the Comptroller General to be erroneous.[4] Nothing, however, compels the Government to make *any* award on a particular solicitation if it does not feel it would be in the nation's interest to do so. In the instant case, because of the erroneous pre-award survey and in order to allow plaintiff a chance to compete subsequently, a third solicitation was ordered. Moreover, and most important, it was determined that the specifications for the first two solicitations were not sufficiently extensive. On the third solicitation, bids were requested for an additional press line, and much additional technical information was required.[5]

---

4. In his letter of April 7, 1970 the Comptroller General stated: "We further believe that exclusion on the basis of the preaward survey was improper." Further on that letter continued: "We do not question Chamberlain's judgment that Lombard's price was unreasonably low, and certainly, the preaward survey confirms the lack of price definition. Nevertheless, the defects revealed by the survey suggest negotiation to remove the doubt, rather than exclusion from the subsequent resolicitation."

5. In a letter to the Comptroller General's office dated Feb. 27, 1970, Chamberlain indicated the reasons for the resolicitation: "As a result of the first and second solicitation * * * it became evident to Chamberlain that the specifica-

For various reasons, plaintiff chose to submit only a summary bid, incorporating its first proposal. Chamberlain, however, allowed all bidders an opportunity to confer regarding corrections or supplements to their proposals. Conferences were held with plaintiff, with extensive time permitted for submission of both oral and written data. While plaintiff did submit some of the required information, its final proposal, in the judgment of the contracting officer, was not responsive enough to evaluate. Exhibit 1A to Defendants' Supplemental Memorandum sets out all of the areas in which Lombard's proposal was deficient. Plaintiff's statement that "we will comply with all specifications" would seem to be insufficient to allow meaningful comparison of bids on specially designed equipment, even when the difference in price between the two lowest proposals is as great as 30%.

This is not a case like A. G. Schoonmaker Co. v. Resor, D.C., 319 F.Supp. 933, in which the low bidder clearly was entitled to the award. In *Schoonmaker*, the plaintiff's technical proposals were acceptable, but because another bidder had been given additional information, the Comptroller ordered that the whole procurement be resolicited. The Court in that case would seem to have acted properly in terminating the resolicitation and ordering that the contract be awarded to the low proposer. We agree with the statement of Judge Gesell in Simpson Electric Co. v. Seamans, 317 F.Supp. 684, that the scope of review in this type case is narrow, and that the variety and complexity of the various situations which will arise make it apparent that courts have a limited function to play in reviewing agency action. Particularly as here, where the subject matter is technical and complex, we are hesitant to substitute our judgment for that of the officer involved.

tions as written were inadequate to assure such technical response from industry as to permit a total and objective evaluation prior to award. Although the

The Court has carefully considered all of the numerous pleadings and memoranda filed in this case, the complete administrative record, various exhibits and affidavits, and the oral arguments of counsel at two separate hearings. It is the judgment of the Court that plaintiff was afforded a fair and complete opportunity to compete on the third solicitation and that, as a matter of law, neither Chamberlain nor Government personnel in authority acted arbitrarily or capriciously in awarding the contract to Erie and Bliss, since Lombard's offer was not responsive enough for comparative evaluation. Accordingly, plaintiff's motion for an injunction is denied, and the Government's motion for summary judgment is granted.

Findings of fact and conclusions of law consistent with the foregoing have been filed this day.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause having come before the Court on plaintiff's motion for preliminary injunction, defendants' opposition thereto, and defendants' motion to dismiss or in the alternative for summary judgment, and plaintiff's opposition thereto, and the Court having considered the pleadings, memoranda of law, the administrative record, exhibits, and affidavits filed in this case, and having considered the arguments of counsel for the parties, makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff, Lombard Corporation, is a corporation organized under the laws of, and has its principal place of business in, the State of Ohio.

2. Defendants herein are Stanley R. Resor, Secretary of the Army, Melvin R. Laird, Secretary of Defense, and Elmer

specifications provided basic functional and other technical requirements, it lacked totally specific guidelines. * * * "

B. Staats, Comptroller General of the United States.

3. The Scranton Army Ammunition Plant located in Scranton, Pennsylvania, is a federally owned facility that is maintained and operated by the Chamberlain Manufacturing Corporation pursuant to a nonprofit cost reimbursable facilities contract with the United States Army. At the present time, and for purposes here, the Scranton plant is engaged in the manufacture for profit of 155 mm. shells which are used by our armed forces and its allies. The shells are sold to the United States by Chamberlain on a fixed cost basis.

4. The Government and Chamberlain are so intimately involved in the operation of the Scranton plant that Chamberlain clearly is not an independent contractor.

5. Because of this relationship and because the facilities contract between Chamberlain and the Government specifically incorporates some provisions of ASPR, the regulations were applicable to this procurement.

6. Chamberlain has been made fully aware of all aspects of this litigation, and therefore has not been unduly prejudiced by not having been formally joined as a defendant in the case. Any prejudice that does exist could be eliminated by intervention.

7. Plaintiff has a legally protected interest in acting as a private attorney general to maintain the integrity of the competitive bidding process.

8. Congress waived the Government's right to sovereign immunity in this type of case, in enacting the Administrative Procedure Act.

9. Plaintiff did not wait an unreasonably long time before filing this action, in view of the novelty of the cause of action, and the limited performance completed pursuant to the contract.

10. Pursuant to its facilities contract, Chamberlain is required to maintain, repair, and rehabilitate the equipment in the Scranton plant. It is also required, with Army approval, to pro-cure and determine the acceptability of new equipment.

11. Involved in this litigation are three solicitations to industry by Chamberlain for design, manufacture and delivery of a quantity of press systems to be utilized by Chamberlain at the Scranton Ammunition Plant.

12. On or about October 1, 1968, Chamberlain, operating under facilities contract No. DC–36–034–AMC–0163(A), as amended, issued requests for quotations (RFO) MP–X–2709 and 2710 for the design and manufacture of two 155 mm. forging press lines. Plaintiff was among the recipients of this solicitation.

13. In conformance with the RFO, plaintiff mailed its proposal on or about October 25, 1968, quoting a total cost of $1,375,000 for the two press lines. The only other proposal was submitted by Verson All Steel Press Company at $3,-582,050. Plaintiff was notified that its quotation was in order and was being evaluated.

14. In December, 1968, representatives of defendants conducted a pre-award survey of plaintiff. The pre-award survey report was dated December 17, 1968 and recommended that no award be made to plaintiff.

15. Based upon the negative pre-award survey report, Chamberlain canceled the initial solicitation. Plaintiff was not informed that its proposal on the first solicitation had been rejected or that the first solicitation had, in fact, been canceled.

16. A second solicitation was issued dated January 24, 1969, RFO MP–X–2709/10. Plaintiff did not receive a request for quotation under the second solicitation.

17. On March 26, 1969, plaintiff filed a protest with defendant Staats after learning informally of the cancellation of the first solicitation and the subsequent resolicitation. Plaintiff's protest was assigned Docket No. B–166532 by defendant Staats. At the time of its protest, plaintiff was unaware of the

reasons for cancellation of the first solicitation.

18. On March 31, 1969, Chamberlain was directed by the Army to suspend action under the second solicitation.

19. On July 9, 1969, a conference was held at the office of defendant Staats to discuss plaintiff's protest. Representatives of defendants and counsel for plaintiff were in attendance. It was proposed by representatives of defendant Staats that Chamberlain cancel the second solicitation and issue a third solicitation in view of the objections raised by plaintiff, but there was no suggestion that plaintiff should receive the contract at that time.

20. Plaintiff repeatedly advised defendants' representatives that its October 25, 1968 quotation of $1,375,000 was extended and could be accepted at any time until expressly withdrawn by plaintiff.

21. In September, 1969, defendant Staats was informed by the Director of Procurement and Production, Army Materiel Command, that the second solicitation had been canceled and that all sources, including plaintiff, had been resolicited. The resolicitation was accomplished by RFO MP–X–2709/10–C dated August 20, 1969.

22. With respect to the third solicitation and pursuant to Modifications 27 and 33 of its facilities contract, Chamberlain, with approval of the Army, agreed to procure for the Scranton plant a new forging system for the 155 mm. projectile. The specifications for the project were supplemented and bids were requested on an additional press line. Industry was allowed the option of proposing either a three-press system (i. e., a system where the three forging operations, (1) preform or "cabbage", (2) backward extrude or "pierce", and (3) elongate or "draw" are done by three separate presses) or a two-press system in which the first and second forging operations are done by a single press and the "draw" operation is completed by the second press. The solicitation re-quired that proposals be submitted either on hydraulic or mechanical presses.

23. The press systems involved herein are not "off the shelf" equipment; they must be specially designed. Specifications of the solicitation required that detailed data be submitted describing the structural, dimensional, operational, and functional characteristics of the presses. The solicitation form specifically identified the technical data requested. In addition, a form was provided for a detailed pricing quotation.

24. Eight industrial concerns were solicited. Five corporations submitted proposals before the closing date on September 26, 1969.

25. In accordance with an agreement at the time of the solicitation, each concern submitting a proposal was granted a conference with Chamberlain for the purpose of negotiating its proposal. Following the conference, each concern was granted a time period within which it could correct, supplement, or finalize its proposal.

26. A conference was held between Chamberlain and plaintiff on October 17, 1969 at the Scranton plant with respect to its proposal. During the conference, Chamberlain advised plaintiff its pricing summary was not relevant to the equipment solicited. Plaintiff was also informed that its technical data was insufficient.

27. Plaintiff was afforded until 5:00 p. m., October 24, 1969, to mail its corrected and revised proposal to Chamberlain.

28. The final proposal of plaintiff was limited to the three-press system. No proposal was submitted for a two-press system. Plaintiff's pricing summary was revised to relate to the appropriate system. However, it was not submitted on the proper form required by the solicitation.

29. Defendant contends that plaintiff's proposal was nonresponsive on approximately 160 lines of technical analytical information, representing more than one-third of the technical data

sought in the solicitation. In support of its position, defendant has submitted an affidavit by William deFee, Chamberlain Corporation, who had the responsibility of evaluating the bids. Plaintiff contested this allegation of nonresponsiveness and in order to show a material fact requiring trial has submitted the affidavits of its president, Dr. Daniel Lombard and its vice president, Daniel Katko, together with supporting documents. Plaintiff's affidavits deny each of the 160 alleged instances of nonresponsiveness. While the Court feels that plaintiff adequately explained some of the alleged deficiencies, it finds as a fact that as to the general question of whether plaintiff's bid was sufficiently responsive for evaluation, there is no material issue of fact, and that the proposal as finally negotiated was too incomplete for adequate evaluation by Chamberlain.

30. Chamberlain, with Army approval, made awards to E. W. Bliss and Company in the amount of $1,984,610 for two press lines and to Erie Foundry Company in the amount of $1,223,050 for one press line.

31. The Court finds as a fact that plaintiff's proposal was not responsive to the solicitation.

32. In the light of the foregoing the Court finds as a fact that plaintiff was afforded a fair and complete opportunity to compete and that it was not prejudiced by Chamberlain's conduct of negotiations.

*Conclusions of Law*

Based upon the foregoing findings of fact, the Court concludes as a matter of law:

1. The Court has jurisdiction over this action pursuant to 11 D.C.Code 521(a).

2. Plaintiff Lombard Corporation has standing to sue.

3. The first two solicitations are not material or relevant to a proper disposition of this case.

4. The Chamberlain Manufacturing Corporation is not an indispensable party to these proceedings.

5. This action is not barred by the doctrine of laches.

6. The doctrine of sovereign immunity is inapplicable to this case.

7. All appropriate procedures for making an award of a contract were adhered to by Chamberlain and plaintiff was afforded a fair and complete opportunity to compete.

8. Chamberlain's decision rejecting plaintiff's proposal was not arbitrary and capricious.

9. Defendants are entitled to judgment on their motion for summary judgment.

10. Plaintiff's motion for a preliminary injunction is denied.