**LOCAL 2816, OFFICE OF ECONOMIC OPPORTUNITY EMPLOYEES UNION, AFGE, AFL-CIO, et al., Plaintiffs,**

v.

**Howard J. PHILLIPS, Acting Director of the Office of Economic Opportunity, and Roy L. Ash, Director of the Office of Management and the Budget, Defendants.**

**No. 73 C 500.**

United States District Court,
N. D. Illinois, E. D.

May 3, 1973.

Davis, Miner & Barnhill, Chicago, Ill., for plaintiffs.

James R. Thompson, U. S. Atty., Robert A. Filpi, Asst. U. S. Atty., Chicago, Ill., John M. Kelson, Atty., U. S. Dept. of Justice, Washington, D. C., for defendants.

### MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

In 1964, by Act of Congress, the Office of Economic Opportunity was created as a special agency operating in the Administrative Office of the President to mobilize the forces of the government and the people to wage a war on poverty. Its activities have continued through these nine years by amendments to the original Economic Opportunity Act of 1964, extending its life for specified numbers of years, authorizing appropriations for specified numbers of years, and from year to year appropriating moneys in increasing amounts to support it. In its authorization amend-

ment of 1972, Congress set up the amount of $870,000,000 for O.E.O. activities for each of the fiscal years, 1973 and 1974; and in its Fiscal Year 1973 appropriations made available to be expended for those certain of O. E. O.'s activities which are the subject matter of this suit, $328,900,000. No moneys, of course, have yet been appropriated and made available for expenditure for Fiscal Year 1974.

Before January 29, 1973, a number of the programs which had been set up and carrried on by O. E. O. had been transferred from that office to other agencies and departments. There remained in the Office of Economic Opportunity little more than the programs it had created and maintained commonly referred to as Section 221 programs. These are programs by which O. E. O. certifies, supervises and substantially funds projects for helping the poor through private organizations and state and local agencies, called Community Action Agencies. In his budget submitted to Congress for Fiscal Year 1974 (which commences July 1, 1973), the President proposed that what remains of O.E.O., i.e., principally the Section 221 funding of Community Action Agencies, be discontinued.

Over the last several months the defendant, Howard J. Phillips, as Acting Director of O. E. O., has notified the personnel of O. E. O., the Community Action Agencies and the public in general that O. E. O. will be discontinued completely by June 30, 1973 and that a "phase out" operation would be completed by that date. Among other things, he has placed certain funding procedures on a month to month basis, he began reducing the number of O. E. O. personnel, and he directed that funds forthcoming be used only for administrative purposes, specifically for closing out activities, and not for operational purposes such as carrying on the programs of the C.A.A.'s. These announcements spelled out a reduction down to complete cessation during Fiscal Year 1973 and prior to its end on June 30, 1973, of all C. A.

A. funding under O. E. O., and a transfer or termination of employment in the O. E. O. agency.

Plaintiffs are representatives of the various classes of persons affected by these acts of Phillips. They include employees of O. E. O. and their labor unions, the C. A. A.'s and their employees, and the many poor or handicapped people who are beneficiaries of the programs of the C. A. A.'s. Charging that these and other related acts of Phillips constitute an unconstitutional and unlawful usurpation by the Executive Branch of our government of the powers of the Legislative Branch, they ask that the judiciary intervene, declare the unconstitutionality of the actions complained of and enjoin Phillips and the Director of the Office of Management and the Budget, from proceeding with a close out of O. E. O.

Defendants, Phillips and Ash, met the cause head-on with motions that it be transferred to the District Court of the District of Columbia where a relatively identical case was filed, that it be dismissed on the principles of sovereign immunity, political question and absence on the part of the plaintiffs of standing to sue, that the actions complained of do not constitute a violation of the Constitution and Laws of the United States, and that under any circumstance, injunctive relief would be improper since the defendants still have until June 30th to exhaust the moneys appropriated for Section 221 activities.

Early in the proceedings before me, I declined to transfer the case to another district because, in light of the facts before me, there was an absence of a statutory basis for it. I denied the motion for a temporary restraining order because I found that considering the court's availability for an early evidentiary hearing on the petition for preliminary injunction, circumstances did not justify a T. R. O. The hearing proceeded on March 26, 1973. Before evidence was heard, on my own motion, I utilized the provisions of Rule 65(a)(2), Federal Rules of Civil Procedure, to advance the

proceedings and cause the hearing to be a trial of the whole case, and the ruling following it to be final and appealable. From today's perspective, considering the limited nature of testimonial and documentary evidence presented by both sides, the removal from the parties of the opportunity to engage in discovery procedures, and the presence in the pleadings of a number of matters yet to be addressed by the parties, I conclude that to cause the parties thus, to proceed would deny them their full day in court. Accordingly, I herewith vacate my order of March 26th advancing and consolidating, and allow the hearing held to have been one only on the Motion for Preliminary Injunction. Mindful, however, of the emergency nature of the matters demanding consideration in this memorandum and order, I assure the parties on both sides that upon request I shall grant certification to lay the foundation for immediate appeal, as provided for in 28 U.S.C. § 1292(b).

Before the hearing I also allowed, subject to objection, plaintiffs to enlarge the designations of the classes they allege they represent to give the case a national scope rather than one limited to the Fifth Region of the Office of Economic Opportunity. For the purposes of a decision on the Motion for Preliminary Injunction, I find a final ruling on defendants' objection to the enlargement of class designations is unnecessary at this time.

### Jurisdiction

As indicated above, defendants object to this action on the grounds of the doctrines of sovereign immunity, political question and lack of standing to sue.

■■■ I find that the doctrine of sovereign immunity does not apply here. There is substantial authority that when a Complaint alleges, as in this case, that a government officer is acting outside his statutory powers or contrary to provisions of the Constitution the doctrine of sovereign immunity is inapplicable. Larson v. Domestic and Foreign Com-

merce Corporation, 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 587–589, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); Kendall v. United States, 12 Pet. 524, 37 U.S. 524, 544 et seq., 9 L.Ed. 1181ff (1838); See reliance for jurisdiction to be sufficient under 28 U.S.C. § 1331(a) in State Highway Commission v. Volpe, et al., 479 F.2d 1099 (8th Cir., 1973). Even greater authority supports the proposition that when Section 10 of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., applies, as it does here, the doctrine of sovereign immunity does not bar an action. As was stated in *State Highway Commission, supra,* and more specifically in its footnote 7: "Although the Supreme Court has not spoken directly to the issue, its recent cases tend to look favorably upon construing Section 10 as an affirmative grant of jurisdiction. See e. g., Rusk v. Cort, 369 U.S. 367, 371–372, 82 S.Ct. 787, 7 L.Ed. 809 (1962); Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 177, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967) (opinion of Fortas, J.); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)." A number of lower court decisions support this proposition including from this circuit, United States v. O'Donovan, D.C., 82 F.Supp. 435, affd. 7 Cir., 178 F.2d 876, 880 (1948).

■■■ I find that the doctrine of "political question" does not apply. It is true that the Judicial Branch of our government will refrain from inquiring into the wisdom of legislative actions or executive actions, or decline to decide disputes between the two which call for determinations of which actions are the more propitious, but it is the duty of the courts to exercise jurisdiction where it is alleged as here that executive action has become legislative rather than administratively regulatory. National Automatic Laundry and Cleaning Council v. Schultz, 143 U.S.App.D.C. 274, 443 F.2d

689, 695 (1971); State Highway Commission of Missouri v. Volpe, et al., *supra*; American Power and Light Co. v. S. E. C., 329 U.S. 90, 118, 67 S.Ct. 133, 91 L.Ed. 103 (1946); Toledo P & W R. R. v. Stover, 60 F.Supp. 587, 593 (1945) (D.C., Ill.).

█ I also find that the plaintiffs, on the basis of the affidavits attached to their Complaint, on the testimony of their witnesses in the hearing before me, and on the basis of matters standing as admitted in evidence, have standing to sue. 5 U.S.C. § 702. They and the classes they represent are sufficiently affected to come within the provisions of the statute. Courts have been allowing a broad reading of the statute to permit persons indirectly as well as directly affected by agency action to sue. In Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970), they were a private organization of persons concerned about the environment; in Crowther v. Seaborg, D.C., 312 F.Supp. 1205 (1970), they were residents in an area near an atomic energy installation; in Lombard Corp. v. Resor, D.C., 321 F.Supp. 687 (1970), plaintiff was an unsuccessful bidder on a government contract; In Krawez v. Stans, D.C., 306 F.Supp. 1230 (1969), the plaintiffs were members of a graduating class of the Marine Academy to whom certain promises had been made by a government agency; and in Ely v. Velde, D.C., 321 F.Supp. 1088 (1970), plaintiffs were residents near a site on which was to be built a state prison with federal funds.

The Supreme Court's observation on the question of standing to sue (See: Assn. of Data Processing Service Organizations, Inc. v. Camp. 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); and Citizens to Preserve Overton Park, Inc., et al. v. Volpe, *supra*, (1971), should leave no doubt that plaintiffs in this action, including the many poor persons who have been beneficiaries of the C. A. A.'s, have "standing to sue".

Accordingly, the Motions of Defendants to dismiss on jurisdictional grounds are denied.

### Evaluation of Defendants' Actions

In order to persist at this time, plaintiffs must have shown that the actions of the defendants have been or sufficiently threaten to be so violative of constitutional or statutory authority as to justify preliminary judicial restraint. In other words, have they constituted or do they sufficiently constitute legislating rather than executing the laws?

In announcing the budget for fiscal year 1974, the President stated as follows:

### Office of Economic Opportunity—

"In 1974 responsibility for certain programs now funded through the Office of Economic Opportunity will be assumed by other agencies, as follows: the migrant program will be delegated to the Department of Labor; Indian programs will be assumed by HEW; Community Economic Development program grantees will be funded by the Office of Minority Business Enterprise at Commerce; health projects will be transferred to HEW; research and development functions will be transferred to the agencies which have statutory responsibility in the fields of current OEO activity. In addition, legislation will be submitted to establish a Legal Services Corporation.

"No funds are requested for the Office of Economic Opportunity for 1974. Effective July 1, 1973, new funding for Community Action agencies will be at the discretion of local communities. After more than 7 years of existence, Community Action has had an adequate opportunity to demonstrate its value. In addition to private funds, State and local governments may, of course, use general and special revenue sharing funds for these purposes. With Community Action concepts now incorporated into ongoing programs and local agencies,

the continued existence of OEO as a separate Federal agency is no longer necessary." Pg. 122; the Budget of the United States Government (Fiscal Year 1974).

On that same day, January 29, 1973, the Office of Economic Opportunity informed all Community Action Agencies of the termination of Section 221 funding, stating in part:

"This memorandum is issued in order to give formal notice of funding changes under Section 221 of the Economic Opportunity Act. * * *

"Section 221 funds are available to OEO, as described below, for awarding Community Action Section 221 grants during the remainder of Fiscal Year 1973 (ending June 30, 1973). Grantees which are scheduled for refunding between now and June 30, 1973, and otherwise qualified for funding, may receive phase-out grants of up to six months.

"The Fiscal Year 1974 budget does not provide funds for any Section 221 grants during the Fiscal Year beginning July 1, 1973. Grantees whose current funding expires after June 30, 1973, will not receive additional phase-out grants, and should start promptly to adjust their affairs so as to close down all activities supported with Section 221 funds prior to expenditure of currently available funds."

The effect of the above-quoted passage is that those C. A. A.'s whose current funding expires on or beyond July 1, 1973 will not be eligible for further federal assistance under Section 221.

Plaintiffs allege that the memorandum of January 29, 1973 constitutes a violation of the statutory requirement, as provided by Section 3(c)(2) of the Economic Opportunity Amendments of 1972, Pub.L. 92–424, 86 Stat. 688, that the Director shall "reserve and make available" not less than $328,900,000 for programs funded under Section 221.

Section 3(c)(2) provides:

"Notwithstanding any other provision of law, unless expressly in limitation of the provisions of this section, of the amounts appropriated pursuant to paragraph (1) of this subsection for the fiscal year ending June 30, 1973, and for the succeeding fiscal year, the Director of the Office of Economic Opportunity shall for each such fiscal year reserve and make available not less than $328,900,000 for programs under section 221 of the Economic Opportunity Act of 1964 and not less than $71,500,000 for Legal Services program under Section 222(a)(3) of such Act."

██ I find that Section 3(c)(2) is concerned only with those amounts which Congress has authorized to be appropriated under Section 221. That means that Section 3(c)(2) applies only to the year in which Congress has actually appropriated funds. In the case at bar, only fiscal year 1973 is involved. Since there has yet been no appropriation by Congress for funding under Section 221 for fiscal year 1974, the statute speaks of the succeeding fiscal year but until Congress actually appropriates funds for the fiscal year 1974 there is no obligation on the part of the defendants to carry out programs with regard to it.

██ As to the phrase "reserve and make available", I find that the question of whether or not defendant Phillips has complied with Section 3(c)(2) as relates to fiscal year 1973 need not be decided before the close of fiscal year 1973. Defendant Phillips has stated that funding of C. A. A.'s will continue during the present fiscal year. On the other hand, certain directives issued by his office have left the certainty of this statement unclear.

The fact is that the actual extent to which funds will be expended for fiscal year 1973 is not easily determinable at this time. I must rely upon the inferences to be drawn from all of his offices' statements and actions.

Plaintiffs contend that any delegation of O. E. O. functions may be accomplished only according to the provisions of the Reorganization Act of 1949, 5 U. S.C. § 901 et seq.

Defendants' response to this argument is that Section 602(d) of the Economic Opportunity Act, 42 U.S.C. § 2942(d) expressly authorizes the Director to delegate any function of the agency. That section reads as follows:

"With the approval of the President (the Director is authorized, in carrying out his functions under this chapter, to—) arrange with and reimburse the heads of other Federal agencies for the performance of any of his functions under this chapter and, as necessary or appropriate, delegate any of his powers under this chapter and authorize redelegation thereof subject to provisions to assure the maximum possible liaison between the Office of Economic Opportunity and such other agencies at all operating levels, which shall include the furnishing of complete operational information by such other agencies to the Office of Economic Opportunity and the furnishing of such information by such Office to such other agencies;"

Thus, Section 602(d) speaks in terms of *any* powers and *any* functions and is unqualified except for the provisions of Section 114 of the Economic Opportunity Amendments of 1969 and the provisions of Section 28 of the 1972 Amendments.

Section 114 of the 1969 Amendments states as follows:

"The authority of section 602(d) of the Economic Opportunity Act of 1964 shall not apply to the Legal Services program authorized under section 222(a)(3) of such Act. The Director of the Office of Economic Opportunity shall not delegate the program authorized under such section 222(a)(3) to any other existing Federal agency."

Section 28 of the 1972 Amendments states as follows:

"Notwithstanding the provisions of section 602(d) of the Economic Opportunity Act of 1964, the Director of the Office of Economic Opportunity shall not delegate his functions under section 221 and Title VII of such Act (Community Economic Development) to any other agency."

■ Thus, it may be seen that the Director of O. E. O. has been empowered by Congress to delegate any function to other agencies with the exception of those under Section 221, Community Economic Development and Legal Services under Section 222(a)(3). At the same time, I note that Section 601(b), 42 U.S.C. § 2941(b) states as follows:

"Notwithstanding the provisions of section 5(b) of the Reorganization Act of 1949, at any time after one year from August 20, 1964 the President may, by complying with the procedures established by that Act, provide for the transfer of the Office from the Executive Office of the President and for its establishment elsewhere in the executive branch he deems appropriate."

If, on the other hand, the President proceeds under the Reorganization Act of 1949 he is granted the power under Section 903(a)(5) to authorize an officer "to delegate any of his functions".

■ In analyzing Sections 601(b) and 602(d) together it becomes evident that Congress has granted the President two methods of moving about O. E. O. activities among the several departments and agencies of the Executive Branch of the government. This, of course, does not constitute authority to discontinue the functioning of the Office of Economic Opportunity and there appears a priority that 221 functions of O.E.O. remain in The Office of The President unless specifically delegated by him or under his special authorization.

■ To the extent that defendant Phillips himself has delegated functions of O. E. O. other than 221 functions, Community Economic Development functions and the Legal Services program

authorized under Section 222(a)(3), he has acted within the law. To the extent to which he has discontinued, if he has, any of the functions of these remaining sections, or set in motion procedures which with a reasonable degree of certainty will bring about their functional discontinuance before the end of fiscal year 1973, judicial intervention on behalf of those aggrieved thereby would be available.

Plaintiffs next contend that the recent announcements and directives promulgated by defendants regarding C. A. A. funding and functioning have not been published in the Federal Register and are therefore null and void.

Section 623 of the 1972 Amendment states:

"All rules, regulations, guidelines, instructions and application forms published or promulgated pursuant to this [Act] shall be published in the Federal Register at least thirty days prior to their effective date."

In response, defendants contend that under the Administrative Procedure Act, 5 U.S.C. § 553, (which had a similar requirement as the 1972 Amendment to the Economic Opportunity Act of 1964) Congress recognized that certain situations arise in which such notice need not be published in the Federal Register within the 30 day period. These situations involve "good cause", and when such "good cause" as stated has been found to exist the courts have held that failure to notify in the Federal Register within 30 days is not determinative of the legality of the Acts involved. Clay Broadcasting Corp. v. United States, 5 Cir., 464 F.2d 1313, 1320 (1972); Buckeye Cablevision, Inc. v. F.C.C., 128 U.S. App.D.C. 262, 387 F.2d 220, 228 (f. n. 34) (1967); Pent-R-Books, Inc. v. U. S. Postal Service, D.C., 328 F.Supp. 297, 312; Borg-Johnson Electronics, Inc. v. Christenberry, D.C., 169 F.Supp. 746, 752 (1959). These cases hold that agencies may rely on publication other than in the Federal Register when for good cause publication in the Federal Regis-

ter appears less than 30 days before the applicable date.

■ Here, it is true, there has been widespread notice other than in the Federal Register. But here also we are dealing with a special notice requirement relative to O. E. O., and clearly the record before me is devoid of evidence from which it can be found that there was good cause for not publishing in the Federal Register the regulations of January 29, 1973, and February 28, 1973 until March 14, 1973, rather than 30 days before their operable dates, other than the reasons for the delay set out in the published notice. If all that is involved is the demise of the Office of Economic Opportunity, on June 30, 1973, publication of the notices in the Register on March 14, 1973 satisfies the statute. If, on the other hand, what is involved is a winding down process as a result of which C. A. A.'s have not or will not receive funds to keep their *operations* going until June 30, 1973, actions of the defendant Phillips cutting out or crippling their functioning between January 29, 1973 and April 14, 1973 could be found to be beyond the law. On the basis of the evidence before me, I have only the total issue of whether or not C. A. A. funding under Section 221 will be discontinued prior to the end of fiscal year 1973.

On April 2, 1973, six days after the parties had formally rested their respective cases there was filed with the Clerk of the Court an affidavit of one Robert Treuer. *Its effect would be a substantial change in the matter as it is now before me.* Plaintiffs moved to quash it on the ground that it was not timely filed. That motion was taken under advisement. I now deny the motion to quash and allow the affidavit to become a part of the evidence.

■ In an emergency matter, such as the instant case, a trial court should not close its doors to any action which would bear upon the relative equities of the parties merely because there has been a formal end to the tendering of

evidence. Activated Sludge, Inc. v. Sanitary Dist. of Chicago, (D.C.Ill.) 33 F. Supp. 692, 693–694 (1940), affirmed C. C.A. 7 Cir. 118 F.2d 899, cert. denied, 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539.

█ This affidavit addresses itself to the concern of each of the principal witnesses appearing on behalf of C. A. A.'s and states as an oath over the affirmance of the officer of the Executive Branch of government responsible for handling their grants that specific C. A. A.'s will be fully funded in conformity with applicable law. It is proper to presume that the substance of Director Treuer's affidavit has been or will be presently enlarged to include all C. A. A.'s in like circumstances throughout the United States. His affidavit states as follows:

"I, Robert Treuer, having been duly sworn, do hereby attest the following matters are true:

1. Based upon records available to me and information obtained in the course of my official duties as Acting Associate Director for Grants and Contracts Management of the Office of Economic Opportunity, I submit the following information on the status of Section 221 funding for the Community Action Agencies named below:

a. Kankakeeland Community Action Program, Inc.—Grant No. 50187. The grantee's funding period expired on February 28, 1973. A grant in the amount of $113,000 for a six-month period beginning March 1, 1973 through August 31, 1973, is being processed in the Regional Office (Region V). A letter dated March 5, 1973, has been sent to the grantee's bank at its request. The letter indicates that the grantee would receive a grant, thereby facilitating its ability to borrow funds to continue the delivery of services to the community.

b. Stark County Office of Economic Opportunity—Grant No. 51054. The grantee's funding period expired December 31, 1972. It will receive a grant in the amount of $170,000 for the six-month period beginning January 1, 1973 through June 30, 1973. The grant has been approved by the Regional Director (Region V) and is being processed. On March 19, 1973, a telegram was sent to the grantee advising that it would receive a grant. A letter of confirmation dated March 27, 1973, was sent to the grantee's bank in order to facilitate its ability to borrow funds to continue program activities.

c. Cook County Office of Economic Opportunity, Inc.—Grant No. 50057.

The grantee's funding period does not expire until March 31, 1973. A grant in the amount of $401,500 for the period beginning April 1, 1973 through August 31, 1973, is being processed in the Regional Office (Region V).

d. Montgomery County Community Action Agency, Inc.—Grant No. 51533.

On December 1, 1972, this grantee received a $300,000 grant to continue work until May 31, 1973. Therefore, this grantee's funding period has not yet expired. The grantee will also receive another $300,000 grant for the six-month period beginning June 1, 1973 through November 30, 1973. In addition, by letter of January 26, 1973, the grantee was authorized to borrow up to $100,000.

e. Community Progress Council of York County—Grant No. 30985.

The grantee's funding period will not expire until May 31, 1973. A grant has already been approved in the amount of $172,500 for the period beginning June 1, 1973 through November 30, 1973.

2. The foregoing grantees, as well as all other grantees receiving funds on or before June 30, 1973, under Section 221, have a responsibility, in accordance with OEO Instructions, (e.g. OEO Inst. 6730–3) to utilize such funds in a manner consistent with the expressed declaration of the President, as contained in his FY 1974 Budget, that no Section 221 funds would be available in FY 1974. Grantees are, therefore, expected to assure that their financial obligations, both to employees and to creditors in the community, are met; and, that they properly account for property in which there is a Federal interest. To the extent that these financial and property responsibilities are discharged, grantees may use the remainder of granted funds to continue carrying out approved program activities for the period of the grant. In addition, under OEO Instructions 6730–3, where grantees have firm commitments for the continued delivery of services through other funding sources once OEO funding is concluded, they may use phase-out grant funds to continue the work program.

/s/ Robert Treuer
  Robert Treuer
  Acting Associate Director for Grants and Contracts Management"

Originally, on April 11, 1973, I entered findings that I had jurisdiction over the subject matter and the parties that the issues were justiciable and the plaintiffs had standing to sue, and that for the purposes of the Motion for a Preliminary Injunction, all of the evidence including the Affidavit of Robert Treuer, supported a conclusion that the actions of the defendants had not constituted actions beyond the law. I declined to issue a preliminary injunction.

Forthwith, plaintiffs moved that I reconsider my determination, charging that the Affidavit of Robert Treuer did not provide a reliable evaluation of defendants' actions. Plaintiffs urged that for the evidence to be opened to receive only the Treuer Affidavit without their being allowed to cross-examine Mr. Treuer and present evidence in rebuttal, would, by depriving them of a meaningful opportunity of confrontation, deny to them their "full day" in court.

I permitted reconsideration. Mr. Treuer appeared as a witness, testified to the matters contained in his Affidavit, and submitted himself to cross-examination. Plaintiffs presented in rebuttal one witness, Mr. William C. Moran, Director for Grants and Contracts Management for the Fifth Region of O. E. O. Mr. Treuer, while reaffirming his statement that C. C. A.'s would receive, during Fiscal 1973, grants for the programs approved for their year without reduction, admitted, on the other hand, that the phase out program had been and was continuing, as directed by defendant Phillips. This meant that some of the moneys forwarded to C. A. A.'s would be used not for their programs but for the closing down of their programs. Mr. Moran's rebuttal testimony was particularly enlightening, and, in the light of his impressive background in O. E. O. management, he spoke with a high degree of credibility. With the chart he qualified for reception into evidence he demonstrated how C. A. A.'s have been operating on a 12 month program year. This program year, as to each, first began on the date of the receipt of the first grant. For its own operational purposes O. E. O. staggered C. A. A. approvals and fundings through much of the fiscal year. This has carried forward over the years and here in Fiscal Year 1973 there are fundings of C. A. A.'s late in the fiscal year for full 12 month program years extending well over into Fiscal Year 1974. It is conceivable that funds promised to these C. A. A.'s will be cut off after June 30, 1973. This however is speculative.

■ Nothing in the Economic Opportunity Act and its Amendments, nor in the Appropriations Bill for Fiscal Year 1973, precludes, in the reasonable exercise of discretion, the utilization of moneys set over to C. A. A.'s for such administrative purposes as would be involved in a phase out activity. Defendants are faced on the one hand with the Budget proposal that O. E. O. be discontinued after June 30, 1973, and on the other their own calculation that before that date Congress will not enact a continuation appropriation bill which would serve to keep O. E. O. alive.

■ According to the evidence, as of April 10th, defendants had spent or had committed for spending approximately $315,000,000 of the $328,900,000 directed by Congress to be reserved and made available for Section 221 programs. The President's budget carries with it traditional indicia of authority subject, as with a condition subsequent, to the determinations of Congress in its appropriations. It is not an abuse of discretion that C. A. A.'s be advised that the proposed budget does not provide for their funding beyond June 30th; (even though the appropriation and not the budget will control); that they are expected to assure O. E. O. that their financial obligations, both to employees and creditors in the community are to be met; that they are to account for property in which the government has an interest; but that to the extent that financial and property responsibilities are discharged, they may use the remainder of granted funds to continue to carry out approved program activities.

From all the evidence including that adduced upon rehearing, I am still of the opinion that preliminary injunctive relief is not called for, since the total issue is whether or not funding of Section 221 activities will be discontinued prior to the end of Fiscal Year 1973, or whether prior to that time the actions of the defendants constitute an unconstitutional abuse of discretion. It seems to me that apprehensions which understandably plaintiffs have, and the great concern of the public that the war on poverty began some nine years ago not be aborted just as it is beginning to show the potential for total victory, direct themselves to the Congressional power. The next meaningful step necessarily must be up to Congress.

Accordingly, I find as I found before. I find that I have jurisdiction over the subject matter and over the parties herein. I find that the issues raised by the Complaint are justiciable and that the plaintiffs have standing to sue. For the purposes of the Motion for a Preliminary Injunction I find from all the evidence, including that heard on reconsideration, that the actions of the defendants do not constitute actions that go beyond the law. The evidence supports a finding that presumably the functioning of the Office of Economic Opportunity will continue as provided by law unless Congress acts to discontinue it or fails to act to cause its continuance and that the Community Action Agencies will be funded for their programs at least through Fiscal Year 1973.

Accordingly, the Motion for a Preliminary Injunction should be and the same hereby is denied.